IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 27, 2024 Session

## ABIGAIL LYNN SEVIGNY v. WARREN MAXWELL SEVIGNY

**Appeal from the Circuit Court for Davidson County**
**No. 19D-1971      Phillip R. Robinson, Judge**
_____

**No. M2023-00325-COA-R3-CV**
_____

This is the second post-divorce contempt case between the parties. While Mother's petition for contempt was pending in the trial court, Father filed a petition alleging that Mother was guilty of 29 counts of criminal contempt for various violations of the parties' permanent parenting plan and the mandatory "Parental Bill of Rights" incorporated into the plan. The trial court: (1) found Mother guilty of seven counts of contempt; (2) sentenced Mother to 29 days in jail; and (3) awarded Father a portion of his attorney's fees and costs. Mother appeals. Because Father failed to meet his burden to show, beyond a reasonable doubt, that Mother was in criminal contempt of the parenting plan, we reverse the trial court's order.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Sean Ross Aiello, Franklin, Tennessee, for the appellant, Abigail Lynn Sevigny.

Helen Sfikas Rogers and Stella Kamm Mallinak, Nashville, Tennessee, for the appellee, Warren Maxwell Sevigny.

## OPINION

### I. Background

Appellant Abigail Lynn Sevigny ("Mother") and Appellee Warren Maxwell Sevigny ("Father") were married in September 2014. In 2016, the parties' only child was

born. By final decree entered in January 2021, Mother was awarded a divorce on the ground of irreconcilable differences. In July and October 2021, Mother filed motions to compel Father to pay the child's private kindergarten tuition from funds held in a 529 account established for the child; Mother also requested account statements as required by the parties' marital dissolution agreement ("MDA"). *Sevigny v. Sevigny*, No. M2022-00953-COA-R3-CV, 2023 WL 4542620, at *1 (Tenn. Ct. App. July 14, 2023) ("*Sevigny I*"). In December 2021, the trial court entered an order reserving ruling, wherein it noted that Mother could initiate criminal contempt proceedings to enforce the MDA. *Id.* In March 2022, Mother filed a petition for criminal contempt. *Id.* In July 2021, the trial court entered an order, dismissing Mother's contempt petition on the ground of double jeopardy. *Id.* at *2. Mother appealed. In July 2023, this Court reversed the trial court's dismissal of Mother's petition and remanded the matter for further proceedings. *Id.* at *7.

In the meantime, in May 2022, Father filed a petition for contempt, alleging that Mother was guilty of 29 counts of criminal contempt for violations of the parties' MDA and the Permanent Parenting Plan ("PPP"), which was incorporated into the 2021 final decree of divorce. In response, Mother challenged both the constitutionality of the statutorily mandated preamble to the PPP, and the Tennessee Code Annotated section 36-6-101 "Parental Bill of Rights" that were incorporated into the PPP.

Following hearings on July 14, July 18, and December 15, 2022, by order of March 1, 2023, the trial court determined that neither the PPP preamble language, nor the Parental Bill of Rights was unconstitutionally ambiguous.[1] Accordingly, the trial court determined that the PPP incorporated into the January 2021 final decree of divorce was a lawful order. The trial court found Mother guilty of seven of the 29 counts of criminal contempt alleged by Father, *i.e.*, Counts 1, 5, 10, 12, 13, 17, and 28 of Father's petition; the trial court found Mother not guilty on the remaining counts.[2] The trial court sentenced Mother to 29 consecutive days in jail but stayed the sentence pending Mother's future strict compliance with the court's orders. Father requested attorney's fees and costs totaling $25,810.25. The trial court awarded Father $6,230.59 in fees and costs under both Tennessee Code

---

[1] Pursuant to Rule 24.04 of the Tennessee Rules of Civil Procedure, Mother filed notice to the Tennessee Attorney General that her defense to 22 of the counts of contempt alleged by Father would require her to call into question the lawfulness, constitutionality, clarity, and ambiguity of the statutory parental rights contained in Tennessee Code Annotated section 36-6-101(a)(3)(B)(i)-(ix) and the preamble to the PPP. On September 29, 2022, the Attorney General filed notice of its intent not to intervene in the case. In its notice, the Attorney General determined that the language of the preamble to the PPP did not derive from any statute or rule. The Attorney General also determined that Mother's concerns regarding the language of the statute applied only to the specific facts of the case and did not call into question the general constitutionality of the statute.

[2] Father voluntarily dismissed seven counts alleged in his petition.

Annotated section 36-5-103(c),[3] and paragraph 25 of the parties' MDA.[4]  Mother filed a timely notice of appeal.

## II. Issues

Mother raises the following issues for review, as stated in her brief:

1.Whether the trial court erred in finding [Mother] in criminal contempt beyond a reasonable doubt in Counts 1 and 5 for violations of the State promulgated and required preamble language and Tenn. Code Ann. § 36-6-101(a)(3)(B)(vi) incorporated into the January 6, 2021 Permanent Parenting Plan.

2. Whether the trial court erred in finding [Mother] in criminal contempt beyond a reasonable doubt in Count 12 for violations of Tenn. Code Ann. § 36-6-101(a)(3)(B)(vii) incorporated into the January 6, 2021 Permanent Parenting Plan.

3. Whether the trial court erred in finding [Mother] in criminal contempt beyond a reasonable doubt in Count 17 for violations of Tenn. Code Ann. § 36-6-101(a)(3)(B)(viii) incorporated into the January 6, 2021 Permanent Parenting Plan.

4. Whether the trial court erred in finding [Mother] in criminal contempt beyond a reasonable doubt in Counts 10 and 28 for violations of the transportation arrangements provisions of the January 6, 2021 Permanent Parenting Plan.

---

[3] Tennessee Code Annotated section 36-5-103(c) provides:

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

[4] Paragraph 25 of the parties' MDA provides:

> In the event it becomes reasonably necessary for either party to institute or defend legal proceedings related to the enforcement of any provision of this Agreement, then the successful party shall also be entitled to a judgment for reasonable expenses, including attorney's fees, incurred in connection with such proceedings.

5. Whether the trial court erred in finding [Mother] in criminal contempt beyond a reasonable doubt in Count 13 for violation of the day to day parenting schedule provisions of the January 6, 2021 Permanent Parenting Plan.

6. Whether the trial court erred in sentencing [Mother] to twenty-nine (29) days in jail, suspended pending Ms. Sevigny's future strict compliance with orders of the trial court.

7. Whether the trial court erred in awarding Father attorneys' fees pursuant to Tenn. Code Ann. § 36-5-103(c) and the Parties' Marital Dissolution Agreement.

8. Whether [Mother] is entitled to a grant of her reasonable and necessary attorneys' fees incurred in pursuit of this appeal and in defense of the claims for criminal contempt.

Father also requests attorney's fees and costs on appeal.

### III. Standard of Review

Three elements are "essential" to a finding of criminal contempt: "'(1) a court order, (2) the defendant's violation of that order, and (3) proof that the defendant willfully violated that order.'" *Hill v. Hill*, 682 S.W.3d 184, 210 (Tenn. Ct. App. 2023) (quoting *Pruitt v. Pruitt*, 293 S.W.3d 537, 545 (Tenn. Ct. App. 2008) (citing *Foster v. Foster*, No. M2006-01277-COA-R3-CV, 2007 WL 4530813, at *5 (Tenn. Ct. App. Dec. 20, 2007))). The petitioner alleging criminal contempt must demonstrate that "(1) the order allegedly violated was lawful; (2) the order was clear and unambiguous; (3) the individual charged did in fact violate the order; and (4) the individual acted willfully in so violating the order." *Id.* (citing *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 354-55 (Tenn. 2008); *Furlong v. Furlong*, 370 S.W.3d 329, 336 (Tenn. Ct. App. 2011) (stating that the four-element analysis outlined in *Konvalinka* applies to criminal and civil contempt actions)). In the criminal law context, "'willfully' connotes a culpable state of mind." *Konvalinka*, 249 S.W.3d at 357. In the context of criminal contempt, "a willful act is one undertaken for a bad purpose." *Id.* (citing *Bryan v. United States,* 524 U.S. 184, 191, 118 S. Ct. 1939, 141 L.Ed.2d 197 (1998); *State v. Braden,* 867 S.W.2d 750, 761 (Tenn. Crim. App. 1993) (upholding an instruction stating that "[a]n act is done willfully if done voluntarily and intentionally and with the specific intent to do something the law forbids")). The standard of culpability to support a finding of criminal contempt is higher than the standard of culpability in the context of civil contempt. *Id.*

On appeal from a trial court's finding of contempt, the appellant bears the burden of demonstrating that the evidence is not sufficient to support the finding. ***Hill***, 682 S.W.3d at 210 (citations omitted). We review a trial court's decision to hold a party in civil contempt under the abuse of discretion standard of review. ***Konvalinka***, 249 S.W.3d at 358. However, "[w]hen the sufficiency of the evidence in a criminal contempt case is raised in an appeal, this court must review the record to determine if the evidence in the record supports the finding of fact of guilt beyond a reasonable doubt, and 'if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt' we are to set aside the finding of guilt." ***Hill***, 682 S.W.3d at 210 (quoting ***Pruitt v. Pruitt***, 293 S.W.3d 537, 545-46 (Tenn. Ct. App. 2008) (citing *see* Tenn. R. App. P. 13(e) (directing that "findings of guilt in criminal actions shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt"))).

## IV. Analysis

Since 1831, the Tennessee General Assembly has statutorily circumscribed the courts' previously "vast and undefined" power to punish contempt. ***Baker v. State***, 417 S.W.3d 428, 435 (Tenn. 2013); ***Sevigny I***, 2023 WL 4542620, at \*3. Tennessee Code Annotated section 29-9-102 provides, in relevant part, that a court may "inflict punishments for contempts of court" for "[t]he willful disobedience or resistance . . . to any lawful writ, process, order, rule, decree, or command of [the] court[]." Tenn. Code Ann. § 29-9-102(3). As we noted in ***Sevigny I***, while "[c]ivil contempt is remedial and intended to force compliance with a court's order, thereby secur[ing] private rights[,]" criminal contempt "is designed 'to preserve the power and vindicate the dignity and authority of the law and the court as an organ of society.'" ***Sevigny I***, at \*3 (quoting ***Baker***, 417 S.W. 3d at 436 (quoting ***State v. Beeler***, 387 S.W.3d 511, 520 (Tenn. 2012))). Therefore, criminal contempt may be punished by fine or confinement. ***Baker***, 417 S.W. 3d at 436. As this Court has emphasized, criminal contempt serves to preserve the authority of the court and "is not to be brandished as a weapon to torment former spouses in order to benefit the adversary." ***Knellinger v. Knellinger***, No. M2012-02343-COA-R3CV, 2013 WL 4714432, at \*8 (Tenn. Ct. App. Aug. 29, 2013).

"[N]otice and an opportunity to respond to the allegations at a hearing[]" are required in proceedings for indirect criminal contempt. ***Baker***, 417 S.W. 3d at 436. (citations omitted). Additionally, "an alleged criminal contemnor, like a person charged with a criminal offense, is presumed to be innocent, must be proven guilty beyond a reasonable doubt, and cannot be compelled to testify against himself." ***Id.*** He or she also is entitled to an attorney, and an attorney may be appointed to represent an alleged contemnor if he or she cannot afford one. ***Id.*** (citations omitted).

The courts have noted that contempt proceedings "are neither wholly civil nor criminal in nature and may partake of characteristics of both." ***Baker***, 417 S.W. 3d at 435 (citations omitted). They "are incidental to the case out of which they arise." ***Id.*** (citation

omitted). Contempt is not defined as a criminal offense by Tennessee Code Annotated section 29-9-102, and a contemnor is "found" or "held" to be in contempt rather than "convicted." **Id.** at 438. Therefore, post-conviction relief "is not available to challenge findings of general criminal contempt arising from civil cases." **Id.** at 439. "Rather, the Tennessee Rules of Civil Procedure provide the avenues for seeking relief from judgments in civil cases." **Id.** at 439 (citing *see* Tenn. R. Civ. P. 59, 60) (additional citation omitted).

In her brief, Mother asserts that "the underlying order and incorporated statutory language that forms the basis for many of [Father's] allegations for criminal contempt are neither clear, specific, nor unambiguous in the context of these contempt proceedings and maintains her actions do not support the findings of criminal contempt." Mother's argument with respect to each count of contempt is two-fold. First, Mother argues that the statutory language and the preamble to the PPP are unclear and unconstitutionally ambiguous. In the alternative, she argues that her actions do not constitute violations of the PPP and MDA, and the evidence is insufficient to prove criminal contempt beyond a reasonable doubt.

Tennessee Code Annotated section 36-6-101(a)(3) sets out nine parental rights. The mandatory PPP preamble is derived from the statutory "Parental Bill of Rights" and provides:

> The mother and father will behave with each other and each child so as to provide a loving, stable, consistent and nurturing relationship with the child even though they are divorced. They will not speak badly of each other or the members of the family of the other parent. They will encourage each child to continue to love the other parent and be comfortable in both families.

We turn first to the trial court's rulings regarding Mother's alleged violations of several provisions of Tennessee Code Annotated section 36-6-101(a)(3).

**(1) Counts 1 and 5—Tennessee Code Annotated section 36-6-101(a)(3)(B)(vi)**

Tennessee Code Annotated section 36-6-101(a)(3)(B)(vi) provides parents with "[t]he right to be free of unwarranted derogatory remarks made about such parent or such parent's family by the other parent to or in the presence of the child[.]" In other words, one parent is not to disparage or denigrate the other parent or that parent's family in the presence of the child. This Court has explained that

> to disparage means: "1. To speak slightingly of; to criticize (someone or something) in a way showing that one considers the subject of discussion neither good nor important. 2. To degrade in estimation by disrespectful or sneering treatment," Black's Law Dictionary (11th ed. 2019); or "to lower in rank or reputation: DEGRADE . . . to depreciate by indirect means (as

invidious comparison): speak slightingly about." Merriam-Webster Collegiate Dictionary 360 (11th ed. 2011); *see also* The Concise Oxford Dictionary 389 (9th ed. 1995) (defining disparage as to "speak slightingly of; depreciate"). To denigrate means "to attack the reputation of: DEFAME" or "to deny the importance or validity of: BELITTLE," Merriam-Webster Collegiate Dictionary 333 (11th ed. 2011), or to "defame or disparage the reputation of (a person); blacken," The Concise Oxford Dictionary 360 (9th ed. 1995). We note that . . . Tennessee by statute provides that parents, in orders pertaining to custody arising from an action for absolute divorce, have "[t]he right to be free of unwarranted derogatory remarks made about such parent or such parent's family by the other parent to or in the presence of the child," and the Permanent Parenting Plan referenced this provision. Tenn. Code Ann. § 36-6-101(a)(3)(B)(vi); *see, e.g.*, **Richardson v. Richardson**, No. M2020-00179-COA-R3-CV, 2021 WL 4240831, at *14 (Tenn. Ct. App. Sept. 17, 2021) (affirming finding of contempt when mother made "unwarranted derogatory remarks" about father in contravention of the parenting plan); **Boren v. Rousos**, No. M2014-02504-COA-R3-CV, 2015 WL 7182141, at *5 (Tenn. Ct. App. Nov. 13, 2015) (upholding criminal contempt for violating a provision prohibiting father from making "derogatory remarks" about mother).

*Nolan v. Nolan*, No. W2021-01018-COA-R3-CV, 2023 WL 4559883, at *16 (Tenn. Ct. App. July 17, 2023).

Turning to the record, in Count 1 of his petition, Father asserted:

On or about May 27, 2021, Mother threatened to call the police on Father in front of the minor child while she was dropping off the child to Father for his parenting time. Father has a recording of the incident that will be showed at the hearing of this matter. Mother could have easily followed the parenting plan and not made derogatory remarks about Father while dropping the child off, but instead willfully chose to do so.

In its final order, the trial court found:

The Mother is GUILTY beyond a reasonable doubt of willful criminal contempt in Count 1 of Father's Petition for Criminal Contempt for violating the preamble and paragraph 6 of the Parental Bill of Rights contained in the Permanent Parenting Plan Order entered on January 6, 2021, which provides that a parent will not make derogatory remarks about the other parent to or in the presence of the parties' child. The Court clearly heard the Mother state she would call the police on the Father in the child's presence in the tape

recording provided by Father. The Mother made this statement on May 27, 2021, in front of the minor child. The Court finds that such a threat to the Father implies that the Father has violated the law to the parties' child and constitutes a violation of the preamble and paragraph 6 of the Parental Bill of Rights contained in the Permanent Parenting Plan Order entered on January 6, 2021.

From our review, the parties' disagreement regarding whether Father was required to return the child to Mother's care at 6:00 p.m. on Memorial Day began three days prior when Father texted Mother to inform her that he would be taking the child out of state for more than 48 hours over the holiday weekend. Father testified that Mother stated that the child was to be returned to her care by 6:00 p.m. on Monday, and he acknowledged that he did not engage in further conversation with Mother. Thus, the issue was unresolved when the parties exchanged the child on May 27 in a Target parking lot. Father testified that, during the May 27th exchange, he placed his cell phone in the center console of his truck, with the speakers pointed toward the driver's side door, and set it to record. After the child was secured in his car seat on the rear passenger side of the vehicle, Mother told the child that she and Father needed to talk for "a second" and she "follow[ed]" Father around the truck to the driver's side. Mother then informed Father that if he failed to return the child by 6:00 p.m. the following Monday, she would call the police. Father testified that Mother "pretty much c[a]me[] into [his] vehicle so that she c[ould] project past me to [the child]," and her only statement to the child was that she would see him at 6:00 on Monday. Father maintained that Mother's statements were derogatory and in violation of section 36-1-101(a)(3)(B)(vi). We disagree. Neither Mother's statement that she would call the police, nor her statement that she would see the child at 6:00 on Monday constitutes a derogatory or disparaging statement aimed at Father. As set out above, Tennessee Code Annotated section 36-1-101(a)(3)(B)(vi) provides each parent with "the right to be free of unwarranted derogatory remarks **made about such parent**" (emphasis added). Mother's comments were not "about" Father and do not meet the definitions set out by this Court in *Nolan*, *supra*. We further note that there is no evidence that the child heard Mother's statements, and the PPP is unclear concerning the specific time that Father was to return the child to Mother on Memorial Day. In short, Father failed to carry his burden to demonstrate that Mother was guilty of criminal contempt beyond a reasonable doubt on Count 1 of his petition, and we reverse the trial court's finding of contempt on this count.

In Count 5 of his petition, Father alleged that Mother "spoke badly about Father to the minor child" on June 22, 2021. Specifically, Father asserted:

> There is a sunken boat in [a] lake that has been there for years. Mother told the child that Father took the light off this sunken boat and that it was considered stealing.

Father also asserted that he had "a recording of the incident." In its order, the trial court

- 8 -

found Mother in contempt, stating:

> The Mother willfully stated in the presence of the child that the Father stole something important from an abandoned wreck of a pontoon boat.

At trial, Father testified that Mother's statement arose from an incident in which he "pulled off" a "red navigation light" that was "hanging off the side of [a] boat[.]" Father testified that the registration on the boat was 12-years old, and the boat was "tied up to a tree and half sunk in the water" in a cove across from the parties' lake house. Father stated that the child: (1) was with Father when he removed the light; (2) was excited to take the light back to Mother's house; and (3) "proudly show[ed]" Father the light mounted with a battery, cord, and switch during a Facetime conversation on June 22. Father stated:

> He was very excited about it, and then I told him that I spoke with the neighbor and that the boat was abandoned and the lake was working on removing it from the lake. And he said, "Well, we need to get all the treasures off it." And I laughed, and then his mother chimes into the call and says, "No. No. That's stealing."

Other than Father's assertion regarding the statement of an unidentified neighbor, there is no proof that the boat was abandoned, and there is no evidence to suggest that its owner intended the boat to be subject to salvage. Nonetheless, Mother instructing the child not to take property that does not belong to him was not disparaging of Father because the statement was neither about Father, nor directed at Father. As such, we conclude that Father failed to carry his burden to show, beyond a reasonable doubt, that Mother was guilty of contempt on this count. Accordingly, we reverse the trial court's order finding Mother in contempt on Count 5.

### (2) Count 12—Tennessee Code Annotated section 36-6-101(a)(3)(B)(vii)

The section provides that each parent has:

> The right to be given at least forty-eight (48) hours' notice, whenever possible, of all extracurricular school, athletic, church activities and other activities as to which parental participation or observation would be appropriate, and the opportunity to participate in or observe them. The parent who has enrolled the child in each such activity shall advise the other parent of the activity and provide contact information for the person responsible for its scheduling so that the other parent may make arrangements to participate or observe whenever possible, unless otherwise provided by law or court order[.]

In his petition, Father alleged that Mother failed to give him 48-hours notice of the child's August 2021 kindergarten parent orientation. At trial, Father testified that he missed the orientation because he did not receive notice of it until 6:26 p.m. on the day it occurred, when Mother texted him the notice. In its final order, the trial court determined that Mother violated the section because "Mother notified the Father the day of the orientation, after it was over."

As an initial matter, we note that, under the section, a parent who enrolls a child in an activity is required to provide "contact information for the person responsible for its scheduling" to the other parent "so that the other parent may make arrangements to participate" when appropriate. Under the statute, both parents have the right to be notified of and to participate in the child's activities. If Mother enrolls the child in an activity, she has an obligation to inform Father and to provide contact information so that Father may obtain the relevant schedule. It is then incumbent on Father to take action to access information that is available to him as a parent.

School is not an "extracurricular" activity, and Father testified that he was aware that the child's school communicates relevant information through a parent's portal on its website. Contrary to his argument at trial, it is Father's responsibility to access school information that is readily available to parents; it is not Mother's obligation to do it for him. At trial, Father testified that, when he was unable to access the school portal, he made one call to the school "months ago[,]" and had not heard back. It was Father's obligation to follow-up with the school to secure his right to access information regarding the child, and there is nothing to indicate that Mother impeded Father's access to the parent's portal or to the school's communications. Nonetheless, trial exhibits indicate that, although not obligated to do so, Mother made at least one call to the school on Father's behalf. Furthermore, Mother texted Father a screen shot of the school's notice about the orientation in response to Father's text asking, "Was there an event at school today[?]" Moreover, the school's notice requested that only one parent attend the orientation "[d]ue to spacing" and recommended that attendees "mask." There is no evidence to show when or how Mother obtained the school notice, and we observe that, at trial, Father acknowledged that he did not know when Mother received the notice. Cumulatively, the evidence is insufficient to demonstrate beyond a reasonable doubt that Mother willfully violated the section by intentionally withholding information regarding a child-related activity that was otherwise unavailable to Father. Accordingly, we reverse the trial court's order finding Mother in contempt on Count 12.

### (3) Count 17—Tennessee Code Annotated section 36-6-101(a)(3)(B)(viii)

The section provides that each parent has:

The right to receive from the other parent, in the event the other parent leaves the state with the minor child or children for more than forty-eight (48) hours,

- 10 -

an itinerary which shall include the planned dates of departure and return, the intended destinations and mode of travel and telephone numbers. The parent traveling with the child or children shall provide this information to the other parent so as to give that parent reasonable notice[.]

In his petition, Father alleged that Mother failed to provide him with an itinerary for an out-of-state trip she took with the child in September 2021. At trial, Father submitted that Mother failed to provide him with the "place, address, time, [and] method of transportation" for the trip. The trial court concluded that Mother was guilty of disregarding the statutory provision when she "took the child to Washington state for more than 48 hours and failed to provide Father with an itinerary of the out of state trip."

The record contains an order entered by the trial court following a hearing in August 2021. In its order, the trial court referenced Mother's testimony regarding a September 3-5, 2021 trip to Seattle, Washington, and a September 17-19 "road trip" to Atlanta. The trial court ordered that Mother would have parenting time for the Labor Day weekend from September 3 to September 7 and from September 17 to September 20. Specifically, the trial court stated that "[t]he child is permitted to travel with Mother to the Seattle, Washington area during this weekend." The trial court also awarded Father parenting time to "reimburse [him] in full for the parenting time lost during these two (2) weekends." At the contempt hearing, Father testified that he recalled Mother's testimony about the trip, but could not recall whether Mother testified with respect to the itinerary or mode of transportation. Father also testified that, following the August hearing, he did not request further details about the trip.

Tennessee Code Annotated section 36-6-101(a)(3)(B)(viii) requires the parent to provide an itinerary of "the planned dates of departure and return, the intended destinations and mode of travel and telephone numbers." Contrary to Father's testimony that Mother did not inform him that she intended to fly with the child to Seattle, the record from the August hearing includes an exhibit indicating that Mother intended to "fly out" on September 3 and "fly home" on September 5. Based on the trial court's September 2021 order, we are satisfied that: (1) Father had actual knowledge of the trip and did not inquire further; (2) the trial court was satisfied with the details provided by Mother; (3) the trial court gave Mother express permission to take the child to Washington state; and (4) Mother complied with the court's order. Accordingly, we reverse the trial court's order finding Mother guilty of contempt on Count 17.

Having addressed the trial court's judgment with respect to Father's allegations of contempt based on the Tennessee Code Annotated section 36-6-101(a)(3), we turn to Father's allegations regarding the remaining provisions of the PPP.

- 11 -

### (4) Counts 10 and 28—Transportation Arrangements

In Counts 10 and 28 of his petition, Father asserted that Mother "unilaterally change[d]" the transportation arrangements set out in the PPP. In Count 10, Father alleged that, on July 24, 2021, Mother texted Father and stated that he was "not allowed at Mother's house." He asserted that Mother's text altered the PPP provision that "the parent beginning his or her parenting time shall be responsible for picking up and dropping off the child at the other parent's home or another location at the beginning and end of his or her parenting time mutually agreed upon in writing." Father alleged that Mother's July 2021 text informing him that she would bring the child to a church parking lot for the exchange constituted a unilateral change of the PPP. In Count 28, Father alleged that, on January 6, 2022, Mother violated the transportation provision when she texted Father to tell him not to pull into her driveway or "come to her door again."

Notwithstanding the PPP provision, from the record, it appears that the parties never exchanged the child at their homes. Father testified that, prior to July 2021, the parties exchanged the child at a church parking lot. Father asked Mother to change the place of exchange to a Target parking lot in Brentwood, and, on July 24 Mother stated in a text that she would not "meet[] in the most busy parking lot again." Father testified that the parties continued to exchange the child at the church, and he "just went along" with the arrangement. Father also testified that his parenting time was not "cut short" by the arrangement, and he could not recall any specific difficulties with the exchanges. Indeed, the parties sometimes exchanged the child at locations other than the church. As Father testified, "the majority of the other times" he picked up the child at Mother's parents' home.

From the record, it is undisputed that the parties' practice was to exchange the child at neutral locations and not at their homes. This was not Mother's unilateral decision, and we conclude that Father failed to meet his burden to show that Mother purposefully disregarded the PPP or the authority of the court in exchanging the child. As such, we reverse the trial court's order finding Mother in contempt on Count 10 and Count 28.

### (5) Count 13—Parenting Schedule

The PPP provides that, beginning May 2021:

Father shall have unsupervised time with the minor child every other Thursday after school or 3:00 p.m. to Monday to take to school or to Mother by 8:00 a.m.

On the weeks when father does not have parenting time for the weekend, Father shall have the child Thursday after school or 3:00 p.m. until 8:00 a.m. Friday to return to school or return to Mother if there is no school.

In his petition, Father alleged that Mother violated this provision on August 10, 2021. Father asserted that the child had a half-day of school on August 10 and that, under the PPP, his parenting time began upon dismissal at 10:45 a.m. He asserted:

> Mother could have allowed Father to pick up [the child] after school at 10:45 a.m. instead of 3:00 p.m., but instead willfully chose not to do so in direct violation of the Permanent Parenting Plan.

At trial, Father acknowledged that the PPP is unclear concerning when Father's parenting time begins when school is dismissed early. Although the parties may disagree concerning interpretation of the PPP provision, the evidence does not support a finding that Mother willfully violated the PPP by insisting that Father's parenting time began at 3:00 p.m. Accordingly, we reverse the trial court's order finding Mother in contempt of this provision.

### V. Attorney's Fees and Remaining Issues

"[U]nder Tennessee law, courts do not decide constitutional questions unless resolution is absolutely necessary for determination of the case and the rights of the parties." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995). Accordingly, we decline to address Mother's constitutional issues as such discussion is unnecessary in view of our holdings. Any remaining issues are also pretermitted.

Having reversed the findings of contempt, we also reverse the trial court's award of attorney's fees to Father, and we deny his request for appellate attorney's fees. As to Mother's request for attorney's fees, the parties' MDA provides that,

> [i]n the event it becomes reasonably necessary for either party to institute or defend legal proceedings related to the enforcement of any provision of this Agreement, then the successful party shall also be entitled to a judgment for reasonable expenses, including attorney's fees, incurred in connection with such proceedings.

Having reversed the trial court's contempt findings, under the MDA, Mother is entitled to her reasonable attorney's fees and costs incurred in defending Father's contempt petition at both the trial level and on appeal. As such, Mother's request for same is granted.

Before concluding, we reiterate the trial court's observation that the relationship between Mother and Father appears to be "toxic," and we join the trial court in urging the parties to work together in the best interest of their young child. We also reiterate that the purpose of criminal contempt is to preserve the authority and dignity of the courts. It is not a weapon to be used to torment former spouses or to vindicate the parties. *Knellinger*, 2013 WL 4714432, at *8.

## VI. Conclusion

The trial court's order finding Mother in criminal contempt, imposing punishment for same, and granting Father attorney's fees and costs is reversed. Father's request for appellate attorney's fees is denied. Mother's request for attorney's fees and costs is granted, and the case is remanded for such further proceedings as may be necessary and are consistent with this opinion, including, but not limited to, calculation of Mother's reasonable attorney's fees and costs at both the trial and appellate level and entry of judgment on same. Costs on appeal are assessed to the Appellee, Warren Maxwell Sevigny, for which execution may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE